IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SHANDORA LEONA STEBBINS,[1]

      Plaintiff,

vs.                          CASE NO. 1:17-cv-39-MW-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Period of Disability and Disability Insurance Benefits pursuant to Title II of the Social Security Act ("the Act") and for Supplemental Security Income pursuant to Title XVI of the Act. (ECF No. 1.) The Commissioner has answered, ECF No. 8, and both parties have filed briefs outlining their respective positions. (ECF Nos. 19, 22.) For the reasons discussed below, it is recommended that the Commissioner's

---

[1] Plaintiff's name on all of her Social Security documents appears as Shandora Stebbins, not Shanbora Stebbins. The **CLERK** is therefore directed to change the docket to reflect the correct spelling of Plaintiff's name. It is unclear why Plaintiff's own attorney has mistyped Plaintiff's name on all of her filings.

decision be affirmed.

## I.  PROCEDURAL HISTORY

Plaintiff filed her Title II and Title XVI applications on May 16, 2013, alleging a disability onset date of August 12, 2012. (R. 20, 63, 71, 158–69.) Plaintiff alleged that she could no longer work due to lupus, depression, and hypertension. (R. 63, 71, 105, 111.) Her applications were denied initially and upon reconsideration. (R. 63–78, 81–102, 105–17, 123–34.) On July 2, 2015, an administrative law judge ("ALJ") issued a decision unfavorable to Plaintiff. (R. 20–30.) The Appeals Council denied Plaintiff's request for review on December 22, 2016. (R. 1–4.) Plaintiff then filed the instant appeal. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560. However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[2] The impairment

must be severe, making Plaintiff unable to do his previous work, or any

other substantial gainful activity which exists in the national economy. 42

U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20

C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the

existence of a disability as defined by the Social Security Act. *Carnes v.*

*Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is

working at a substantial gainful activity, he is not disabled. 20 C.F.R. §

404.1520(b). Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe

impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a

claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a

claimant's impairments (considering his residual functional capacity

---

[2] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

### III.  SUMMARY OF THE RECORD

Plaintiff's medical records cover the time period from 2011 to 2015 and are from Gainesville Family Physicians, North Florida Regional Medical Center, Shands Hospital, Alachua County Health Department, Meridian Behavioral Healthcare, and Vascular Interventional Physicians. Because the issue on appeal relates to Plaintiff's credibility, the relevant portions of the medical record, the opinion evidence, the hearing testimony, and the ALJ's findings are summarized below.

### A.  Medical Evidence

In 2011 and 2012 Plaintiff visited Dr. Jackson at Gainesville Family Physicians. Her lab results revealed diagnoses of Vitamin B deficiency, lupus erythematosus, and hypertension. Other diagnoses included migraines, tension headaches, lumbago, neck pain, rash, abdominal pain, right upper quadrant pain, and chest pain. Her physical examinations, however, revealed overall normal findings other than some moderate tenderness and aching in the cervical area and legs at times and some

occasional limited range of motion at the hip and neck. Imaging in 2011 revealed transitional lumbsacral segment with partial lumbarization of S1-S2, and a hip exam showed degenerative changes without acute fracture. But Plaintiff's other tests and exams were normal. Plaintiff was prescribed various medications and referred to physical therapy to decrease pain and improve range of motion. (R. 254–92, 360–75, 797–857.)

Plaintiff visited North Florida Regional Medical Center in August 2012 where her discharge diagnoses included severe headache and severe back and neck pain. Her physical exam findings during her stay were normal, aside from mild tenderness in the cervical spine, upper right abdomen, and neck as well as appearing in pain. An MRI of the cervical spine revealed a nonspecific chronic-appearing lesion at C2, but it did not require any treatment. The chest x-rays and head CT were normal. The impression was acute headache, and Plaintiff was given medication and told to avoid exertional activities for only a week. (R. 296–354, 734–92.)

Plaintiff returned to North Florida Regional Medical Center in 2013 regarding right upper quadrant abdominal pain. Her physical exam findings were normal other than distress and tenderness from pain in that area, and her abdomen CT and chest exams were unremarkable. She experienced

relief from medications and was discharged. (R. 388–402.)

Plaintiff also visited Shands at the University of Florida in 2012 and 2013. In October 2012 her discharge diagnoses included chest pain that was likely musculoskeletal, SLE, and hypertension, and her discharge physical exam was normal. Her other testing revealed no acute cardiopulmonary disease. Notably, an SLE flare up was thought to be unlikely, and her lupus was noted as stable. She returned in November 2012, complaining of leg pain. Her physical exam findings were normal apart from tenderness and swelling in the right thigh. The clinical impression was a muscle strain. (R. 407–27, 459–526, 1050–52.)

In January 2013 Plaintiff again complained of chest pain. Her physical exam findings were normal as were her chest x-rays. Her diagnosis included nonspecific chest pain, but it was noted that she had a normal myocardial heart test and normal cardiac enzymes. Then in April 2013 Plaintiff complained of pain on her right side and was diagnosed with acute right flank pain. Her physical exam findings were normal other than tenderness in the right upper quadrant, and her CT scan of the abdomen and pelvis did not contain findings to explain the right-sided flank pain. (R. 527–91, 1040–44.)

In May 2013, however, Plaintiff again presented with chest pain, among other things, but her discharge diagnosis was viral gastroenteritis causing dehydration and syncope. She had a normal EKG and CT scan of her head. Additionally, a lupus flare was ruled out by blood test. Then Plaintiff returned at the end of May, complaining of headache, fever, and swollen neck. Her physical exam findings were normal, and she was diagnosed with a headache and viral illness. (R. 527–632.)

Plaintiff returned in July 2013, complaining of abdominal pain, and she was diagnosed with right upper quadrant pain. Yet other than tenderness in that area, her physical exam findings were normal. Her chest x-ray revealed underinflated lungs without acute cardiopulmonary abnormality, and she had no acute abdominal abnormality. (R. 697–716.)

Her clinical visits from the Alachua County Health Department in 2012 and 2013 revealed overall normal physical exam findings. Her diagnoses varied throughout her visits, and they included benign essential hypertension, unspecified chest pain, unspecified back ache, right upper quadrant abdominal pain, lump or mass in breast, bronchitis, probable phlebitis and thromophlebitis of deep veins of lower extremities, unspecified hyperlipidemia, and situational depression.(R. 428–53,

636–67, 681–91.)

With regard to Plaintiff's mental health, Plaintiff also underwent mental health screening in May 2013 at the Alachua County Health Department. She was diagnosed with depressive affective disorder, single episode, severe, without mention of psychotic behavior. She complained of worsening depression in August, but her mood and affect were appropriate during her mental status examination. (R. 634–35, 684.)

Plaintiff also visited Meridian Behavioral Healthcare at the Crisis Stabilization Unit from July 29, 2013, to August 1, 2013, voluntarily due to depression. She was diagnosed with major depressive affective disorder. (R. 722–27, 860–63.)

Plaintiff also received care from the Alachua County Health Department in 2014. She complained of a rash on her hand and neck as well as migraine headaches and right arm tingling. Her physical exams revealed normal findings other than a skin rash and some weakness in her right arm at times. Her diagnoses included benign essential hypertension, severe tinea dermatophytosis of the hand, cough, disturbance of skin sensation, and headaches. (R. 993–1008.)

In 2014 Plaintiff also returned to North Florida Regional Medical

Center. In April Plaintiff complained of shortness of breath and right-sided

neck pain as well as some mild chest discomfort. Her chest exam revealed

no evidence of acute cardiopulmonary disease. One consulting doctor

noted that Plaintiff's symptoms were not cardiac but instead

gastrointestinal. A CT of the cervical spine revealed high-grade foraminal

stenosis on the right at C2-3 and on the left at C7-T1 as well as disc

protrusions from C2-3 through C4-5. (R. 926–46.)

In August Plaintiff returned due to heart fluttering. A chest x-ray

revealed no evidence of acute cardiopulmonary disease, and an MRI of the

cervical spine revealed developmentally narrow spinal canal. There was

also degenerative spondylosis resulting in varying degrees of additional

acquired spinal canal and foraminal stenosis. Her physical examinations,

however, were unremarkable. Upon discharge, it was noted that her chest

pain was most likely musculoskeletal in origin. (R. 900–24.)

Plaintiff returned to North Florida Regional Medical Center in January

2015. She complained of a skin rash, shortness of breath, and a headache

as well as right upper extremity weakness. Her physical exam findings

were normal other than her skin rash and possible hives. Her chest x-ray

revealed no cardiopulmonary abnormality, and her head CT and MRI were

unremarkable. An MRI of Plaintiff's neck revealed C4-C5 left paracentral

disk extrusion caudally (cervical herniated disk), and the impression was

cervical radiculopathy. Notably, the doctor found that there was no need for

urgent surgical decompression. She was, however, prescribed a cane to

walk. (R. 867–98, 949–72, 981–82.)

Plaintiff also visited Vascular & Interventional Physicians in January

2015. She underwent a technically successful C7-T1 epidural steroid

injection. The doctor noted that facet joint steroid injections could also be

considered in the future. (R. 975.)

Additionally, she visited the Orthopaedic Institute at the end of

January 2015. Plaintiff's physical examination and neurological evaluation

returned normal findings, including 5/5 strength in her extremities and a

normal gait. The impression was cervical spondylosis causing pain, and

the plan was to continue conservative care, including medication for pain.

(R. 978–79.)

Plaintiff also visited Shands in January, February, and March 2015.

Plaintiff was diagnosed with an aneurysm arising from the left superior

hypophyseal arteria without evidence of acute hemorrhage or secondary

findings of cavernous carotid fistulla, and her head CT did not show a

structural cause for her headaches. There was no acute intracranial abnormality, no evidence of pulmonary embolism, and no acute cardiopulmonary disease. Additionally, her leg exam showed no evidence of lower extremity DVT. In March, however, Plaintiff was diagnosed with subacute cutaneous lupus erythematosus, which was to be treated with medication. She was told to continue activity as tolerated at discharge. (1011–39, 1068–75.)

In 2015 Plaintiff also visited the Alachua County Health Department. Her physical examinations were overall normal, with some decreased range of motion and muscle strength that was improved by February 2015. Her diagnoses included back pain, sinusitis, benign essential hypertension, and an aneurysm of the neck artery. (R. 985–92.)

## B.  Opinion Evidence

On reconsideration, Dr. Junejo, a state agency consultant, completed an RFC assessment. He determined that Plaintiff can lift and/or carry 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for a total of 6 hours in an eight-hour workday. He did not find that Plaintiff had any other limitations. (R. 88, 99.) This was consistent with the RFC determinations at the initial level by the single decision makers. (R. 68, 76.)

## C.  Hearing Testimony

At the hearing on April 15, 2015, Plaintiff was 53 years old. Plaintiff did not complete high school or obtain a GED, but she did complete culinary courses at Taylor Technical Institute. Plaintiff testified that her previous work consisted of working as a dietary aid, a waitress at restaurants, and an assistant manager and cashier at convenient stores. Her last job was as a waitress at Reb Lobster, but she said being on her feet that long was not good. Plaintiff also said her disability began on August 12, 2012. (R. 36–43.)

Plaintiff said that when she sits for longer than two hours she has pain down her neck and back. She also said that she can only stand for about an hour and a half. Additionally, she has trouble with her balance when she has muscle spasms in her leg, which happens two or three times a day. She also walks with a cane that was prescribed in January. (R. 43–44, 54–55.)

Plaintiff also testified about some of her medical problems. She said that in January she was in the emergency room regarding her right arm and the doctors found out she had an aneurysm and a rash. They started treating her with Prednisone, which she takes on and off. She also testified

that she has headaches every day, which some of her doctors attributed to lupus, and elevated blood pressure. She takes medication for the elevated blood pressure.  She also said she had to go to the hospital the previous month due to the rash, and she now tries to stay inside to prevent the rash from getting worse. She also received oxycodone for her headaches. Additionally, she has cervical myelomalacia that causes pain in her neck as well as chronic right upper quadrant pain, which affects her two or three times a day. (R. 44–47, 50–54, 56.)

Plaintiff said she also has problems with depression that comes and goes. She said she was not on any medication for it at the time of the hearing. She said she previously took medication, but it caused suicidal thoughts so she stopped taking it. She also went to counseling, but she did not find it helpful and could not afford to keep going. (R. 55–56.)

Plaintiff also discussed her living situation and daily activities. She said she lives with her daughter, her daughter's fiancé, and her daughter's two children. She said on an average day she takes care of her personal hygiene, helps with chores like sweeping and mopping, prepares meals, does dishes, and reads a lot. However, once she experiences pain she either takes medicine or tries to sleep off the pain. Additionally, she said

she has muscle spasms three or four times a day, so she takes muscle relaxers for that. She also does some exercising and stretching, such as walking a short distance, until she starts hurting. She drives occasionally and goes grocery shopping with her daughter, but she says she cannot lift and carry more than ten pounds. She also said she can dress herself, but her daughter does her hair. (R. 47–50, 56.)

## D.  The ALJ's Findings

The ALJ found that Plaintiff meets the insured status requirements of the Act through December 31, 2018, and that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of August 12, 2012. The ALJ also found that she has the following severe impairments: essential hypertension (HTN) and immunodeficiency disorders. However, none of these impairments, or a combination thereof, meets or medically equals the severity of one of the listed impairments. (R. 20–23.)

Based on the entire record, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work, except she cannot have exposure to concentrated temperature extremes or the sun, she cannot reach overhead, and she must have the option of performing job tasks in either a seated or standing position, known as a sit–stand

option. (R. 24.)

The ALJ then found that Plaintiff was not capable of performing any past relevant work. However, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including Ticket Seller, Counter Clerk, and Mail Clerk. Accordingly, the ALJ concluded that Plaintiff was not under a disability at any time from August 12, 2012, through the date of the decision, July 2, 2015. (R. 27–30.)

## IV.  DISCUSSION

Plaintiff phrases the issue on appeal as follows: The ALJ should have found Plaintiff disabled at Step Five because "it is entirely credible that as a direct and proximate result of her combination of impairments [she] cannot be present and function in the workplace over time eight (8) hours a day five (5) days a week." Further, even if Plaintiff could be present, her SLE flares and migraine headaches would cause her to require too much additional break time to meet the expectations of her employer. Lastly, Plaintiff goes on to state that "no one who needs came [sic] to stand and walk can perform light work." (ECF No. 19 at 17–19.)

If the ALJ decides to discredit the claimant's testimony as to her subjective symptoms, the ALJ must articulate explicit and adequate

reasons for doing so or the record must be obvious as to the credibility

finding. *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995). While the

ALJ does not have to cite particular phrases or formulations, broad findings

that a claimant was not credible and could work are, alone, insufficient for

the Court to conclude that the ALJ considered the claimant's medical

condition as a whole. *Id.* at 1562. The ALJ's articulated reasons must also

be supported by substantial evidence. *Jones v. Dep't of Health & Human

Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a

properly articulated credibility finding that is supported by substantial

evidence. *Foote*, 67 F.3d at 1562.

        In this case the ALJ determined, after considering the record

evidence, that Plaintiff's

> medically determinable impairments could reasonably be
> expected to produce some of the alleged symptoms and her
> testimony regarding the intensity, persistence, and limiting
> effects of these symptoms is found to be generally credible.
> These assertions, however, are not consistent with a finding of
> "disability" within the meaning of the Social Security Act and its
> implementing regulations . . . . It is important to note that the
> objective medical evidence does not support the level of
> limitation caused by [Plaintiff's] alleged subjective experience of
> symptoms. Accordingly, the undersigned cannot simply accept
> [Plaintiff's] assertions as her maximum capabilities.

(R. 25.)

In making the credibility assessment, the ALJ considered the medical and opinion evidence, Plaintiff's daily activities, and Plaintiff's subjective statements about the intensity, persistence, and limiting effects of her symptoms. (R. 24–28.) Substantial evidence supports the ALJ's credibility assessment as well as the ALJ's RFC determination.

The ALJ first discussed Plaintiff's hearing testimony, which included some of Plaintiff's subjective statements about her symptoms and the resulting limitations. For example, at the hearing Plaintiff said she can no longer work because she can only sit for two hours before having back and neck pain and because she can only stand for about an hour to an hour and a half. Additionally, Plaintiff said she has daily headaches and upper body pain two to three times a day. Other alleged limitations included only lifting ten pounds, an inability to carry anything heavy or keep her hands above her head, and using a prescribed pain for balance problems due to leg spasms. (R. 24–25, 43–56.)

The ALJ then compared these subjective complaints to the objective evidence in the record. The ALJ noted that the medical records revealed although Plaintiff was hospitalized on multiple occasions from 2012 to 2014, her complained-of conditions resolved with treatment by discharge.

The ALJ further reasoned that although Plaintiff had diagnoses of severe headaches, chest pain, back pain, and neck pain, as well as a history of hypertension, hyperlipidemia, and SLE, the majority of her physical examinations and test results during this time revealed normal findings. Notably, in October 2012 and May 2013 SLE flare-up was thought to be unlikely. (R. 25, 296–354, 388–402, 407–53, 459–632, 636–67, 681–91, 697–716, 734–92, 900–46, 993–1008, 1040–44, 1050–52.)

More recently in 2015 Plaintiff had extensive testing performed. In January her physical exam findings were normal apart from skin lesions and subjective intermittent paresthesias of the right upper extremity. And by February 2015 her physical exam findings were normal. Her head CT and chest examination were unremarkable. Further despite an MRI of her cervical spine showing C4-C5 left paracentral disc extrusion, effacement of the anterior thecal space and flattening of the cord, and myelomalacia dorsal at C3, Plaintiff did not have instability or balance problems. At discharge in January, her diagnosis was right upper extremity weakness due to cervical cord compression, and her secondary diagnoses included reported history of SLE, dermatitis, headache, and hypertension. In February her assessments included well-controlled benign essential

hypertension, carotid aneurysm, and acute sinusitis. The ALJ also noted

that although Plaintiff was treated with Prednisone for lupus, the ANA and

DS-DNA testing performed in January were negative, a finding which the

ALJ concluded suggested that Plaintiff did not actually have lupus. (R. 26,

867–98, 949–72, 978–79, 981–82, 1011–39, 1068–75.)

Lastly, in March and April 2015, Plaintiff was diagnosed at Shands

with subacute cutaneous lupus erythematosus, and her symptoms

improved with treatment. A rheumatology consultation revealed that her

SLE manifested in photosensitive skin changes, pleuritic chest pain, joint

symptoms, and hair thinning, and she was treated with Plaquenil. (R. 26,

1011–39, 1068–75.)

Overall, the objective evidence includes medical records from doctors

and other medical professionals that undermine Plaintiff's credibility. The

ALJ concluded

> The evidence shows that her immunodeficiency disorder is
> productive of symptoms which include joint pain and weakness,
> fever, and skin rashes. However, the evidence does not
> suggest that this condition is experienced at a level of intensity
> and/or frequency that would preclude her from performing all
> work. The evidence shows minimal flare-ups of SLE, and does
> not indicate that these flare-ups cause functional limitation that
> would prevent all work. Her physical examinations and
> diagnostic testing have generally not shown significant
> abnormalities related to her severe impairments, and recent

medical evidence showed no joint abnormalities or swelling, full range of motion and full strength in all extremities, and no gross motor dysfunction. Additionally, while she indicated at the hearing that she has an aneurysm which requires stenting, the medical evidence of record does not support this assertion. With regard to her hypertension, the evidence describes this condition as being benign and well-controlled, and does not suggest that it is associated with substantial health complications. Taken as a whole, the evidence does not establish that the claimant's severe impairments are productive of a level of functional limitation that precludes the performance of all basic work activities, as is required for a finding of disability.

(R. 26–27.)

In addition to the objective medical evidence, the ALJ also discussed and properly considered Plaintiff's testimony regarding her daily activities. These activities included taking care of hygiene and attempting to do household chores, including sweeping and mopping. Plaintiff said she can dress herself, prepare simple meals, and wash dishes as well. Plaintiff also said she does some exercising until she feels pain, but she does not like to take pain medication. She goes grocery shopping with her daughter, although she rides in an electric cart, and she reads a lot. (R. 27, 47–50, 56.) The ALJ noted that these types of daily activities are consistent with an ability to perform competitive work. *See also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (noting that reports of daily activities are also a

proper consideration in making a credibility determination).

Additionally, the ALJ considered the opinion evidence in the record, noting that no opinion evidence suggests that Plaintiff is disabled or incapable of performing work in accordance with the ALJ's RFC determination. Specifically, Dr. Junego opined that Plaintiff could perform light work with no additional limitations, and the ALJ gave this opinion great weight as consistent with the other objective medical evidence in the record. (R. 27, 68, 76, 88, 99.)

The ALJ also explicitly considered the combined effects of Plaintiff's impairments and the possibility that the combined effect could be greater than each of Plaintiff's impairments considered separately. The ALJ noted that this combination was considered when assessing the listings and during each step of the sequential evaluation process, including in making the RFC determination. (R. 27.)

After considering Plaintiff's testimony and the medical record, the ALJ found that Plaintiff's "subjective complaints are out of proportion with the objective medical findings contained in the record." (R. 25.) Thus, while the record does show limitations—as accounted for the in ALJ's RFC determination that Plaintiff is capable of only light exertional work with a

sit/stand option and restrictions for environmental conditions and manipulative activities—they do not support Plaintiff's testimony regarding the severity of her pain and limitations. Ultimately, "[w]hile [Plaintiff's] impairments produce limitations, the objective evidence as a whole does not suggest that such impairments render her unable to perform any work, and the limitations that do exist are adequately accommodated within her residual functional capacity assessment." (R. 27.)

As is evident in the ALJ's opinion, the ALJ properly considered Plaintiff's testimony and her daily activities, the objective medical evidence, and the opinion evidence in the record, eventually finding that while Plaintiff's impairments could produce some of her alleged symptoms and that her testimony was generally credible the record does not support the level of limitation asserted by Plaintiff's subjective recitation of her symptoms. Accordingly, consistent with the objective medical evidence and the opinion testimony  the ALJ found that Plaintiff can perform light work with a sit–stand option, no overhead reaching, and some environmental limitations.

Plaintiff argues that due to her SLE flares and headaches she cannot function in a workplace full-time or meet the productivity demands of her

employer. As support for this argument Plaintiff relies upon her diagnosis

with lupus and severe acute headaches. Specifically, Plaintiff says "[b]ased

on those two diagnoses it is entirely credible that she would suffer from

chronic, fluctuating, deblitating pain. Therefore, substantial evidence fully

supports plaintiff Stebbins' testimony with regard to the chronicity and level

of her pain resulting from lupus flares and the additional work related

problem of her severe headaches." She also makes the conclusory

allegation that no one who needs a cane can perform light work. (ECF No.

19 at 19, 22–23.)[3]

The problem with this argument is that a mere diagnosis is not

dispositive of disability. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6

(11th Cir. 2005) ("[T]he mere existence of these impairments does not

reveal the extent to which they limit her ability to work or undermine the

ALJ's determination in that regard."); *see also McCruter v. Bowen*, 791

F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically

ascertained disability must be measured in terms of its effect upon ability to

_____

[3] In Plaintiff's argument, she also includes a quoted exchange between the ALJ and the vocational expert. Plaintiff then goes on to say that "ALJs always misinterpret vocational testimony by assuming the disability claimants won't have any percentage of time off task other than the time they would spend dealing with pain or mental health issues." (ECF No. 19 at 19–21.) Plaintiff, however, fails to connect this quoted testimony to the ALJ's decision in *this* case or show how it proves that Plaintiff is disabled.

work . . . .") Disability is about functional limitations on a claimant's ability to engage in work activities and not simply whether a claimant can point to a diagnosis.

Despite Plaintiff's argument to the contrary, the ALJ did not err in discrediting Plaintiff's testimony as evidenced by the record as a whole and the ALJ's opinion. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) (noting that "[t]he question is not . . . whether ALJ could have reasonably credited [the plaintiff's] testimony, but whether the ALJ was clearly wrong to discredit it"). Because the ALJ's credibility assessment is properly articulated and is supported by substantial objective medical evidence, the Court concludes that the ALJ did not err in his credibility assessment.

Lastly, without citation to the record, case law, or regulations, Plaintiff makes the following argument: "[T]he entire time this matter's been pending before the court plaintiff Stebbins has been in the 55–60 age cohort. Therefore, at a minimum based on ALJ Barlow's findings, plaintiff Stebbins is currently, and has been since her 55th birthday disabled pursuant to rule 202.02 of the medical vocational guidelines." Plaintiff then says the Court should remand this case with specific instructions to place

Plaintiff "in pay status as of her 55th birthday." (ECF No. 19 at 23–24.)

This argument has no merit. That Plaintiff is now older than she was on the date of the ALJ's decision does not warrant remand of this case. Plaintiff's condition has been assessed through the date of the ALJ's decision, and the fact that Plaintiff is now older is irrelevant. Because, as discussed above, substantial evidence supports the ALJ's credibility assessment and RFC determination, Plaintiff has provided no reason to remand this case.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 15th day of February 2018.

*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations**

as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.